# EXHIBIT A

Filed
D.C. Superior Court
06/28/2018 13:47PM
Clerk of the Court

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | |
|---|---|
| **Ahmed Fateh** ) | |
| 3424 Bedivere Ct. ) | |
| Annandale, Virginia 22003 ) | |
| ) | |
| **Plaintiff**, ) | |
| ) | |
| **v.** ) | Case No.: _____ |
| ) | |
| **King Abdullah Academy** ) | |
| 2949 Education Dr, ) | |
| Herndon, VA 20171 ) | |
| ) | |
| **The Embassy of the Kingdom** ) | |
| **of Saudi Arabia** ) | |
| 601 New Hampshire Ave NW, ) | |
| Washington, DC 20037 ) | |
| ) | |
| **Defendants.** ) | |
| ) | |
| _____ ) | |

### COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Ahmed Fateh, through his undersigned counsel, hereby files this Complaint and Demand for a Jury Trial and states:

### PARTIES

1.  Plaintiff Ahmad Fateh ("Fateh") is an adult resident of the United States and currently resides in Northern Virginia.  Fateh is an African American, a first generation Somali American and a non-Arab Muslim.

2.  Defendant King Abdullah Academy ("KAA") is a Saudi Arabian international school with the stated mission per its website of enabling "students to excel academically while maintaining the values of Islam and proficiency with the Arabic language."

*3.* Defendant The Embassy of the Kingdom of Saudi Arabia ("Embassy") is the Kingdom of Saudi Arabia's main and largest diplomatic mission to the United States

## JURISDICTION

4. This Court has jurisdiction over this action pursuant to D.C. Code § 11-921 (2001). Venue is proper in this forum, as Defendants KAA and the Embassy regularly conduct business in the District, and the principal subject events occurred in the District.

5. This Complaint is timely. Mr. Fateh was terminated from his employment on May 3, 2017. On February 14, 2018, he filed a complaint with the District of Columbia Office of Human Rights ("DCOHR"), which remained pending with the DCOHR until April 12, 2018 (57 days), at which time the DCOHR issued an Administrative Dismissal without Prejudice of Mr. Fateh's complaint. Accordingly, the one-year statute of limitations that governs Mr. Fateh's claims under the DCHRA was tolled for this period of 57 days while the matter was before the DCOHR, making this action timely if filed on or before June 29, 2018.

## FACTS

6. Complainant Ahmed Fateh is 30 years old, an African American, and a first generation Somali American. He was born in Washington D.C., raised in Northern Virginia and in 2009 graduated from George Mason University with a degree in Psychology. For nearly a decade, Mr. Fateh has worked for various companies in the area as an employee recruiter.

7. In November of 2016, Mr. Fateh was hired by KAA as an employee recruiter. Mr. Fateh was given an employment contract and was tasked with finding and vetting staff to fill vacant positions at the school. Mr. Fateh reported to Diane Wilkins, the head

of Human Resources at KAA, and interacted daily with Chris Faisander, a native of Australia and KAA's principal.

8.   KAA is named after the previous king of the Kingdom of Saudi Arabia.  Per its website, KAA is an educational initiative of the Saudi Government that educates students from ages 4-18 and is dedicated to "culture, inclusiveness, and dual language Arabic/English programs."  KAA admitted its first incoming class of students in 2016. Most of the students at KAA are of the Muslim faith and predominantly of Saudi or Middle Eastern national origin.  Indeed, many of the students at KAA are children or relatives of Embassy personnel or staff.

9.   Shortly after he began working for KAA, Mr. Fateh learned that KAA is tightly controlled by the Embassy, which is located in the District.  At all relevant times, the Embassy was closely and actively involved in the formation and day-to-day operations of KAA.  On information and belief, KAA was financed with funds provided by the Saudi Royal Family, which were funneled through both the Embassy and the World Bank.  As part of their oversight of the school and its operations, Embassy officials made regular visits to the school.  The central role of the Embassy in KAA's operations was known throughout the KAA community.  Indeed, parents within the KAA community would routinely request that the Embassy overrule decisions of KAA leadership and staff with which they disagreed. The Embassy's control over KAA's internal operations even extended to involvement in issuing student report cards.

10.   Consistent with this central role in KAA's operation, the Embassy also exercised control over employment-related decisions at KAA.  Indeed, KAA and the Embassy were joint employers, as defined under law, of employees at KAA, including Mr. Fateh, in that

the Embassy, *inter alia*, exercised control over matters governing essential terms and conditions of employment at KAA, including hiring, firing, discipline, compensation and contract non-renewal/termination decisions.  By way of example, at all relevant times, KAA's Head of Finance worked four days a week from the Embassy and only one day a week at KAA.  On information and belief, the Embassy approved the specific terms and conditions of Mr. Fateh's contract of employment at KAA, and Mr. Fateh's paychecks for work at KAA were approved and/or signed by Embassy personnel.

11. Initially, Mr. Fateh was excited by the prospect of working at KAA, as he was interested in the educational field and knew that KAA was a new school with an international student body.  However, soon after he started, KAA's principal, Mr. Faisander, began making comments towards Mr. Fateh that betrayed strong discriminatory animus against him.  Mr. Faisander soon developed a highly negative tone and attitude towards Mr. Fateh that was distinctly different and more derisive than the tone and attitude he would use with other KAA employees who did not share Mr. Fateh's race, national origin and/or religious status.  Even routine exchanges with Mr. Faisander began to turn racial and rancorous.  By way of example, on one occasion, Mr. Faisander became frustrated with Mr. Fateh because Mr. Fateh could not find a file and blurted out, "I don't give a fuck if you go back to Africa."  On another occasion, Mr. Faisander berated Mr. Fateh for not completing a task (that actually had been completed) and walked off, muttering, "these fucking people." On yet another occasion, Mr. Faisander told Mr. Fateh pointblank, "I don't respect your kind."  Mr. Fateh knew from other statements made by Mr. Faisander in the workplace that "these people" and "my kind" were references to Mr. Fateh's race and/or national origin.  On another occasion, Mr.

Fateh heard Mr. Faisander mutter the word "nigger" after walking away from an acrimonious exchange between the two of them.

12. Mr. Faisander's ugly discriminatory animus was not just directed at Mr. Fateh. During the relevant time period, Mr. Faisander made other discriminatory comments in the workplace about persons who, like Mr. Fateh, were African American; African; and/or Muslims not of Saudi or Middle Eastern original.  For example, at one point he referred to employees as being on "Africa time," to mean late or slow, and stated derisively that the United States is "not Somalia."  Mr. Faisander also betrayed his discriminatory biases through his actions, insisting on one occasion that Mr. Fateh provide him photographs of any potential job candidates so Mr. Faisander could discern the race of the job candidate.

13. Mr. Faisander also expressed discriminatory animus on the basis of religion/national origin towards Mr. Fateh, who is a devout Muslim not of Saudi or Middle Eastern origin.   On one occasion, for example, Mr. Fateh was praying over a lunch break when Mr. Faisander told him, "I don't want you praying. And I don't give a fuck what or who you are praying to."  In stark contrast, Mr. Faisander treated KAA employees who were Muslim but from Saudi Arabia or the Middle East with respect and deference in relation to their exercise of their Muslim faith.

14. These ongoing comments and discriminatory actions by Mr. Faisander were unwelcome and sufficiently severe and pervasive to alter the terms and conditions of Mr. Fateh's employment.  Nevertheless, despite this ongoing hostility from Mr. Faisander, Mr. Fateh continued to perform the duties of his job effectively, received accolades regarding his performance and was not the subject of any disciplinary measures.

15.  In response to Mr. Faisander's pervasive discriminatory animus, Mr. Fateh made at least five complaints to KAA's Human Resources personnel, to no avail.  On several occasions Ms. Wilkins, the KAA's Director of Human Resources, told Mr. Fateh that she had tried to discuss his complaints with Mr. Faisander, but that Mr. Faisander had reacted with derision and anger, dismissing Mr. Fateh's strong concerns without any further action.  Mr. Fateh learned that on one occasion, Mr. Faisander took one of his written complaints and dismissively flung it across the desk.

16.  KAA and the Embassy did not investigate or act effectively upon Mr. Fateh's complaints.  Instead, KAA, in close coordination with the Embassy, decided to discriminate and/or retaliate against Mr. Fateh by terminating his contract/employment on May 3, 2017.  On information and belief, this decision to terminate Mr. Fateh's contract/employment was made at a meeting that Mr. Faisander attended with Embassy officials in the District of Columbia, consistent with KAA's established practice of not making employment-related decisions without first receiving instruction, ratification and/or approval from officials at the Embassy.

17.  Mr. Fateh's experience with discriminatory animus at KAA was not an isolated incident, but rather part of a pattern and practice of racial, ethnic and/or religious animus that has permeated the KAA workplace.  For example, as the end of the 2016-2017 school year neared, KAA began a process of selecting faculty and staff to be recommended for termination and for retention. The KAA Board, with the participation of, and in consultation with, officials of the Embassy, reclassified a number of employees from "retain" or "on the fence" to "terminate."   These individuals were disproportionately non-Muslim or of non-Saudi Arabian descent. A number of other

employees were reclassified from "on the fence" or "terminate" to "retain." These employees were substantially less qualified than those employees moved to "terminate," and were disproportionately Muslim employees of Saudi Arabian descent.

18. Similarly, Mr. Fateh's experience with retaliatory animus at KAA was not an isolated incident, but rather also part of a pattern and practice of retaliatory abuses against employees who dared to complain about KAA's illegal discriminatory practices. In or about May 2017, a respected teacher at KAA, an African American Muslim, had complained about egregious, racist conduct by a student in his classroom. The student, who had close ties to the Embassy, had mocked this teacher while in class, repeatedly asking the teacher if he was from "'Nigger'ia" and deriding him with a term in Arabic that means "slave." The teacher, who speaks Arabic, was stunned by this appalling, racist behavior and complained to Mr. Faisander about this conduct, only to have his employment contract abruptly non-renewed within two weeks. Before making this complaint, the teacher had been told he was going to become part of the Executive Team or "Pastoral Council" at KAA, evidencing that there was no intent to terminate him prior to his complaint.

19. Defendants' actions and/or omissions as alleged herein constitute willful misconduct, were in bad faith, were wanton, were outrageous, were done without just cause or excuse, were done with malice and/or were done with conscious indifference or reckless disregard of Defendants' legal obligations toward Mr. Fateh and/or were done with the intent to injure or harm Mr. Fateh personally, professionally and financially.

20. As a proximate result of Defendants' actions or omissions as alleged herein, Mr. Fateh has suffered, and continues to suffer, *inter alia*, (1) economic harm, including loss

of back pay and front pay and associated employment benefits; (2) damage to his professional and personal reputation and ability to obtain commensurate gainful employment; and (3) severe emotional distress, including the onset of debilitating panic attacks, significant weight gain, chronic sleeplessness and persistent feelings of low self-worth.

## COUNT I

**Discrimination in Violation of the D.C. Human Rights Act**
**(All Defendants)**

21. Mr. Fateh incorporates by reference each and every preceding paragraph, as though set forth in full herein.

22. Mr. Fateh is a member of a protected class based on his race, religion and national-origin.

23. Mr. Fateh suffered adverse employment actions, in that his employment was terminated on May 3, 2017 when his employment contract was not renewed.

24. Mr. Fateh's race, religion and/or national origin was/were a substantial factor in Defendants' decisions to terminate him from his employment with KAA.

25. The decision by KAA and the Embassy to terminate Mr. Fateh's employment was not attributable to a legitimate reason.

26. Defendants' actions and omissions as set forth herein constituted willful misconduct, were in bad faith, were wanton, were outrageous, were done without just cause or excuse, were done with malice and/or were done with conscious indifference and/or reckless disregard of Mr. Fateh's protected rights under the D.C. Human Rights Act.

27. Mr. Fateh suffered actual injury as a result of Defendants' actions and omissions.

## COUNT II

### Hostile Work Environment in Violation of the D.C. Human Rights Act
### (All Defendants)

28.  Mr. Fateh incorporates by reference each and every preceding paragraph, as though set forth in full herein.

29.  By their actions as alleged herein, KAA and the Embassy engaged in conduct toward Mr. Fateh that was unwelcome.

30.  KAA and the Embassy's conduct, as alleged herein, was based on Mr. Fateh's race, religion and/or national origin.

31.  The conduct at issue was sufficiently pervasive or severe to alter the conditions of Mr. Fateh employment and create an abusive working environment, and did, in fact, alter the conditions of Mr. Fateh's employment and create an abusive working environment, culminating in Mr. Fateh's termination.

32.  All actions committed by employees of KAA and Embassy were committed within the scope of their actual or apparent authority.

33.  Employees of KAA and Embassy had actual or constructive knowledge of the hostile working environment created by the continued harassment of Mr. Fateh and took no effective action to correct the situation.

34.  As a direct and proximate result of KAA and the Embassy's actions, Mr. Fateh suffered injury and is entitled to compensatory and punitive damages.

## COUNT III

### Retaliation in Violation of the D.C. Human Rights Act
### (All Defendants)

35. Mr. Fateh incorporates by reference each and every preceding paragraph, as though set forth in full herein.

36. Mr. Fateh engaged in protected activity in that he complained about and opposed practices made unlawful under, *inter alia*, the D.C. Human Rights Act.

37. KAA and the Embassy took adverse personnel actions against Mr. Fateh, including, *inter alia*, terminating his contract/employment effective May 3, 2018.

38. Mr. Fateh's opposition to practices made unlawful under the D.C. Human Rights Act were motivating factors in the decision by KAA and the Embassy to terminate Mr. Fateh's contract/employment, and a causal connection exists between Mr. Fateh's opposition to unlawful practices and KAA and the Embassy's adverse employment action.

39. The actions and omissions by KAA and the Embassy as set forth herein constituted willful misconduct, were in bad faith, were wanton, were outrageous, were done without just cause or excuse, were done with malice and/or were done with conscious indifference and/or reckless disregard of Mr. Fateh's protected rights under the D.C. Human Rights Act.

40. Mr. Fateh suffered actual injury as a result of these actions and omissions by KAA and the Embassy.

## COUNT IV

### Violation of 42 U.S.C. § 1981
### (All Defendants)

41. Mr. Fateh incorporates by reference each and every preceding paragraph, as though set forth in full herein.

42. KAA and the Embassy discriminated against Mr. Fateh in violation of the rights afforded him by the Civil Rights Act 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

43. By the conduct described above, KAA and the Embassy intentionally deprived Mr. Fateh, an African-American, of the same rights that are enjoyed by white and non-African Americans citizens to the creation, performance, enjoyment, and all benefits and privileges, of his contractual employment relationship with KAA, in violation of 42 U.S.C. § 1981.

44. As a result of KAA and the Embassy's discrimination in violation of 42 U.S.C. § 1981, Mr. Fateh has been denied employment opportunities providing substantial compensation and benefits, thereby entitling him to injunctive and equitable monetary relief and has suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of KAA and the Embassy's actions, thereby entitling him to compensatory damages.

**45.** KAA and the Embassy acted with malice or reckless indifferent to the rights of Mr. Fateh in their discriminatory actions, thereby entitling him to an award of punitive damages.

**WHEREFORE**, Mr. Fateh demands judgment against Defendants as follows:

1)   Find the Defendants jointly and severally liable for Mr. Fateh's damages and award him compensatory damages in an amount to be determined at trial, but not less than $2,000,000;

2) Find the Defendants jointly and severally liable for Mr. Fateh's damages and award him punitive damages in an amount to be determined at trial, but not less than $3,000,000;

3)   Award Mr. Fateh's attorneys' fees, costs and pre- and post-judgment interest; and

4)   Award Mr. Fateh such other relief as this Court determines just and proper.

## JURY TRIAL DEMAND

Mr. Fateh hereby demands a trial by jury as to all issues and claims so triable in this matter.

Respectfully submitted,

KIYONAGA & SOLTIS, P.C.

/s/Paul Kiyonaga

Paul Y. Kiyonaga
D.C. Bar 428624
Debra Soltis
D.C. Bar 435715
Marcus T. Massey
D.C. Bar No. 1012426
910 17th St., N.W., Suite 800
Washington, D.C. 20006
Phone: (202) 363-2776
pkiyonaga@kiyosol.com

June 28, 2018                                         *Counsel for Plaintiff Ahmed Fateh*